HOBSON, Justice (Ret.).
This case is here upon a petition for a writ of certiorari directed to the Florida Public Service Commission. Petitioner seeks a review by this Court of an order entered by the Commission which denied petitioner’s application for an extension of its existing certificate.
The application sub judice filed by the petitioner, Fleet Transport Company of Florida, sought an extension of its existing certificate to transport only a few additional commodities (principally phosphate rock and superphosphate) in a limited area, Hillsborough and Polk Counties. Its application was supported by two large industries located in the area, namely, U. S. Phosphoric and Florida Nitrogen.
U. S. P. purchases phosphate rock from the mines in Hillsborough and Polk Counties and has the rock transported to its manufacturing plant in East Tampa (Hills-borough County). Because of a favorable rail rate, it utilizes rail transportation for 70 per cent of its transportation needs. It maintains a continuous-flow, 24-hour-a-day type of operation which requires the flexibility obtainable from motor carrier service for the remaining 30 per cent of its transportation needs. The other supporting shipper, Florida Nitrogen, pur *296 chases superphosphate from U. S. P. and other suppliers in Polk County and has it transported to its manufacturing plant located in Tampa (Hillsborough County), Florida Nitrogen has no facilities for unloading this commodity when shipped by rail, and therefore it uses motor carrier transportation exclusively for this particular commodity. The Protestant, Redwing Carriers, Inc., is the only motor carrier certificated to transport the subject commodities in Hillsborough and Polk Counties. Thus, both U. S. P. and Florida Nitrogen are compelled to depend entirely upon Red-wing for their motor carrier transportation of the subject commodities.
Ironically, two or more motor carriers are certificated and are available to transport all other commodities required by the two supporting shippers. Only in the case of the commodity which is absolutely essential and vital to their manufacturing operations (phosphate rock in the case of U. S. P. and superphosphate in the case of Florida Nitrogen) are these two shippers relegated to the service of a single carrier.
That Redwing’s motor carrier service does not adequately meet the demands of the two supporting shippers was conclusively shown by the testimony of their representatives. In its order denying the petitioner’s application for authority to provide additional motor carrier service to these shippers, the Commission took note of this, apparently accepted Redwing’s purported “explanation” (referred to more fully hereafter) of the reasons for the recurrent delivery failures, and denied the petitioner’s application. It is this order which is before the court for review.
As to U. S. P.’s transportation problems with Redwing, U. S. P.’s traffic manager testified that Redwing would fail to meet U. S. P.’s delivery schedule, whereupon a complaint would be made and the service would improve; that the service would be satisfactory for a couple of weeks “and then it happens again”; that they go through the same cycle on an average of every two weeks; that this has been going on for several years and is very disturbing to the plant as it interrupts their flow of rock. In its order the Commission stated that U. S. P.’s complaint “was explained by Protestant [Redwing] as being due to their inability to load on a. regular basis.” If this statement was intended to be a finding that Redwing’s recurrent failures to meet U. S. P.’s phosphate rock delivery schedules were due to loading problems at the mines rather than to Redwing’s own inefficiency or incapacity or indifference, such a finding is not supported by competent substantial evidence.
This court said in Andrews v. C. B. S. Division etc., Fla.1960, 118 So.2d 206, that “if the evidence is not logical and reasonable a finding based on and supported by such evidence would be based on incompetent evidence and hence be contrary to law.” It is neither reasonable nor logical to infer that the transportation problem described by U. S. P.’s representative, recounted above, resulted from loading delays at the mines. Therefore, the Commission’s conclusion to this effect is not supported by competent evidence.
Nor can the writer find in the record any substantial evidence to support such a conclusion. “Substantial” evidence is that which establishes “a substantial basis of fact from which the fact at issue can be reasonably inferred.” DeGroot v. Sheffield, Fla. 1957, 95 So.2d 912. The fact at issue in this phase of the case was the adequacy of Redwing’s service to U. S. P. Admittedly, it was not adequate; and there is nothing in the record to show that its inadequacy was due to circumstances beyond Redwing’s control.
The evidence showed that U. S. P. purchases and transports phosphate rock principally from three mines in the “pebble rock” area in Polk County. Redwing’s witness said that there were no loading problems at two of the mines; that he “only” *297 ran into the problem when he loaded at Smith-Douglas’s mine. It was then shown by petitioner’s witness (an official of Smith-Douglas) that Smith-Douglas had been selling phosphate rock to U. S. P. for transportation by motor carrier only for two or three months prior to the time of the hearing- Q- E. D.: Redwing failed completely to prove that U. S. P.’s transportation difficulties with Redwing, recurring periodically over a period of several years, were due to loading delays at the mines.
As to Florida Nitrogen’s transportation problems, there was testimony by its traffic manager of innumerable delays and failures to deliver the required number of loads of superphosphate and the number of times they had been compelled to close down this operation due to Redwing’s failure to deliver. In disposing of this complaint, the Commission made the following remarkable statement in its order:
“Part of their difficulties appear to arise from the fact that they have no railroad siding to receive superphosphate by rail and that they have limited storage for superphosphate.”
The Commission could have said, with equal logic and candor, that Florida Nitrogen could avoid its transportation problem with Redwing by moving its plant from Tampa to Polk County, next door to its principal supplier, or by purchasing and operating its own fleet of motor tractors and trailers! Obviously, the quoted statement is a pure gratuity, completely irrelevant to the fact immediately at issue, viz., the adequacy of Redwing’s service to Florida Nitrogen and the cause of the admitted inadequacy. In this connection the Commission also said:
“Conflicting testimony by Florida Nitrogen’s witnesses and that of Protestant’s witness would also indicate that difficulties also arise from the past inability of one of Florida Nitrogen’s principle suppliers to load Protestant’s trucks at regular intervals, as well as the length of time Florida Nitrogen has taken to unload each truckload.”
There is no competent substantial evidence to support this conclusion, if one may call it that, of the Commission.
Such a conclusion is vulnerable to the same attack, as to “competency”, as was Redwing’s attempted explanation of the reason for failures in delivery to U. S. P., since Florida Nitrogen’s traffic manager testified that, after a complaint, the service would improve and then “go right back.”
It is also susceptible to attack under the “substantial evidence rule”, quoted above, since the evidence is too flimsy to support a conclusion that the delivery delays and failures complained of by Florida Nitrogen were due to loading and unloading delays.
The “conflicting evidence of protestant’s witness,” referred to by the Commission, was that of one Kent, who testified to loading delays at the plant of American Agricultural Chemical Company, one of the three companies which supplied superphos-phate to Florida Nitrogen. Mr. Kent was regularly employed by Redwing as a truck driver and he had never, as a driver, made a delivery of superphosphate to Florida Nitrogen. He based his testimony on a short period of time (about a month, he said) during which he had served as a temporary dispatcher for Redwing, in January or February, 1963. He was also serving as dispatcher at the time of the hearing (January of 1964). The loading problem at AAC’s plant was corrected in November of 1963; yet it was shown that Florida Nitrogen had delays in deliveries during that month also.
In sharp contrast to this testimony was that of Florida Nitrogen’s traffic manager, who had daily contact with the problem and who said that he had on numerous occasions investigated the cause of the delivery failures and had found them to be a transportation rather than a supply problem. There is no reason to doubt *298 the credibility of this witness. But even if we do (as the Commission apparently did), we can find in Redwing’s evidence no substantial basis from which to infer that the delays and failures in superphos-phate deliveries encountered by Florida Nitrogen for going-on two years, frequently requiring a total shutdown of this phase of its operations, were caused by a loading delay at AAC’s plant or by an unloading delay at Florida Nitrogen’s plant.
 One further point should be considered, and that is, the effect upon the existing transportation facilities of the granting of the application for duplicating authority, as required by Sec. 323.03(3), Florida Statutes, F.S.A. The Commission found merely that the granting of the petitioner’s application “would have an adverse effect” upon Redwing. There is not a scintilla of evidence in the record to this effect. Presumably, any competition whatsoever would have some kind of an adverse effect upon a single existing carrier. It would destroy its favorable monopolistic posistion, if nothing else. While it is the policy of our statute “to avoid duplication of investments and maintenance and operating expenses and avoid inordinate commercial traffic on the highways that will tend to congestion and danger to traffic in general” [1] the statute does not contemplate a complete monopoly where the public convenience and necessity for additional service is shown. Cf. Coast Cities Coaches, Inc. v. Florida Railroad & Public Utilities Commission, Fla.1962, 139 So.2d 674, 675; Greyhound Corporation etc. v. Carter, Fla. 1960, 124 So.2d 9; Great Southern Trucking Company v. Mack, Fla.1951, 54 So.2d 153; Tamiami Trail Tours v. Florida Railroad Commission, 1937, 128 Fla.25, 174 So. 451.
It is well settled that the “public convenience and necessity” required to be shown is not an absolute or strict necessity. All that is required is a “reasonable necessity to meet a convenience of the public.” Greyhound Corporation, etc., v. Carter, supra, 124 So.2d 9, quoting with approval Re John T. Donovan (Colorado Pub. Util. Comm.) 1921 D PUR 488. While the representative of one of the supporting shippers (U. S. P.) did not state unqual-ifiedly that he would utilize the services of petitioner, should the subject application be granted and the service of Redwing be improved, it would seem that the effect of the competing service would be sufficient to warrant the granting of the duplicating authority here requested. It was so held by the comparable federal regulatory commission in Herrin Transportation Company Extension — Jacksonville, 12 Federal Carriers Cases, par. 33,865, in which the facts were strikingly similar to those in the instant case. In granting duplicating authority the Interstate Commerce Commission said that,
“ * * * reasonable competition is in the public interest and should stimulate service and increase commercial intercourse between the areas involved. In addition it should serve as a deterrent to future deteriorations in service which are contrary to the public interest.” (Emphasis added.)
As to the general dissatisfaction with Redwing’s service in transporting the subject commodities, we can take judicial notice of the petition of another applicant (McKenzie Tank Lines, Inc.) to provide the same duplicating service contemplated by the application sub judies, which application was heard by the Commission shortly after the entry of its ordei denying the application sub judice. (See Redwing Carriers, Inc. v. Mason, Fla.1965, 177 So.2d 465, in which this Court affirmed the Commission’s taking jurisdiction of the McKenzie application within six months after denying the petitioner’s application.) There is in the record before the court the petitioner’s Extraordinary Petition for *299 Rehearing to the Commission, pointing out that both U. S. P. and Florida Nitrogen, as well as representatives of four other shippers of the subject commodities in the Polk-Hillsborough County area, supported the McKenzie application and at the hearing on the McKenzie application representatives of all six shippers testified that, should the application of Fleet (the petitioner here) be granted, they would utilize Fleet’s services in the transportation of the subject commodities. The verity of the petitioner’s allegations to this effect in its Extraordinary Petition, which was filed with and denied by the Commission prior to the entry of its final order in this cause, denying petitioner’s Petition for Reconsideration, has not been questioned.
Finally, it should he noted that the petitioner was found by the Commission to be “qualified in all respects to provide the proposed transportation.” It was also shown that the petitioner, under its existing authority, is presently engaged in transporting other commodities from Hillsborough into Polk County. If the requested authority were granted, the petitioner could utilize (with minor modification) its existing equipment to transport the subj ect commodities on the return trip rather than “deadheading.” Thus, one of the primary considerations in the granting of these certificates (conservation of the highways for use of the public, see Florida Motor Lines v. State Railroad Commission, 1931, 101 Fla. 1018, 132 So. 851; Central Truck Lines v. Railroad Commission, supra, 160 So. 26) would be served by granting the subject application.
In all the circumstances shown by this record, it is inconceivable that the Commission would find that the granting of the subject application was not reasonably necessary to serve the convenience of the public. Certainly, as to the two supporting shippers, this cannot be gainsaid, and they, under the issues created and presented, constitute the criterion for determination of the “public convenience and necessity.”
The real, ultimate and controlling question in this case is whether Redwing carried the burden of proving its plea in the nature of confession and avoidance. It is our view that Redwing failed completely to sustain its position by competent, substantial evidence which accords with logic and reason.
The evidence in support of Redwing’s thin explanation of its recurring poor or inadequate service, if it could be considered competent and substantial, does not accord with logic and reason in the face of the positive testimony that when somewhat regular although intermittent complaints were necessarily made, improvement followed. The unanswered query immediately comes into focus: How could Redwing each time complaint was made promptly improve its service if the poor or inadequate service were in truth attributable to “their inability to load [and unload] on a regular basis” because of loading problems at the mines, loading delay at AAC’s plant and unloading delay at Florida Nitrogen’s plant? The attempt of Redwing to place responsibility for its inadequate or poor service upon the shoulders of the suppliers of the subject commodities and one of its customers, taxes the credulity of the most naive much less that of veteran triers of the facts in judicial or quasi-judicial proceedings.
When considering this case one should bear in mind the fact that the Supreme Court of Florida in construing F.S. Section 323.03(3), F.S.A. has held that it is the continuing duty of a certificated carrier to provide service sufficiently adequate to meet “the public convenience and necessity.” We further stated that the language in said section: “ * * * which ‘may reasonably be required by the commission’ ” should not be interpreted to mean that the commission need “first require, or formally require, such service.” Finally, this Court said, “When a new certificate is applied for, the certificated carrier has the burden of explaining why it has not met the need *300 * * [2] Our construction of F.S. Section 323.03(3) F.S.A., is certainly the appropriate and proper “yardstick” to be used in the instant case wherein over a long period of time the only certificated carrier authorized to transport the products herein involved within the specified area has failed to meet its continuing duty “time[s] without end,” and further failed to carry its “burden of explaining why.”
For the reasons stated the petition for a writ of certiorari is granted and the challenged order entered by the Commission is quashed with directions that the application filed before the Commission by the petitioner be granted.
. THORNAL, C. J., and THOMAS, DREW, O’CONNELL, CALDWELL and ERVIN, JJ., concur.

. Central Truck Lines v. Railroad Commission, 1035, 118 Fla. 555, 160 So. 26.

. Alterman Transport Line v. Carter, 88 So.2d 594. See also the opinion prepared by Mr. Justice Drew in Tamiami Trail Tours v. Carter, 80 So.2d 322. Although said opinion was receded from on petition for rehearing it was reinstated and adopted as the law in this jurisdiction in Alter-man.